IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.

ANDREW SCHERR

NO. 3:19-CR-00225-S

### FACTUAL RESUME

In support of Andrew Scherr's plea of guilty to Count One and Count Two of the Indictment, the Defendant, Andrew Scherr, and the Fraud Section, Criminal Division, U.S. Department of Justice (the government) stipulate and agree to the following:

### ELEMENTS OF THE OFFENSES

To prove the offense alleged in Count One of the Indictment, charging a violation of 18 U.S.C. § 371, that is, Conspiracy to Commit Crimes by or Affecting Persons Engaged in the Business of Insurance Whose Activities Affect Interstate Commerce, in violation of 18 U.S.C. § 1033(c), the government must prove each of the following elements beyond a reasonable doubt:

*First* – That the defendant and at least one other person made an agreement to commit crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce, as charged in the indictment;

*Second* – That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third* – That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.[1]

To prove the substantive offense of Crimes by or Affecting Persons Engaged in the Business of Insurance Whose Activities Affect Interstate Commerce, in violation of 18 U.S.C. § 1033(c), the government must prove each of the following elements beyond a reasonable doubt:

*First* – The Defendant was involved in a transaction relating to the conduct of affairs of a business of insurance whose activities affected interstate commerce;

*Second* – The Defendant knowingly made a false entry of material fact in any book, report, or statement of such person engaged in the business of insurance; and

*Third* – The Defendant made such material false statement with the intent to deceive any person, including any officer, employee, or agent of such person engaged in the business of insurance, any insurance regulatory official or agency, or any agent or examiner appointed by such official or agency to examine the affairs of such person, about the financial condition of solvency of such business.[2]

To prove the offense alleged in Count Two of the Indictment, charging a violation of 18 U.S.C. § 1349, that is, Conspiracy to Commit Wire Fraud Affecting a Financial

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A. (5th Cir. 2015).
[2] *United States v. Broughton*, 689 F.3d 1260 (11th Cir. 2012).

Factual Resume—Page 2

Institution, the government must prove each of the following elements beyond a reasonable doubt:

*First* – That the defendant and at least one other person made an agreement to commit the crime of wire fraud affecting a financial institution; and

*Second* – That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.[3]

To prove the substantive offense of Wire Fraud Affecting a Financial Institution, in violation of 18 U.S.C. § 1343, the government must prove each of the following elements beyond a reasonable doubt:

*First* – That the defendant knowingly devised or intended to devise any scheme to defraud;

*Second* – That the scheme to defraud employed false material representations, false material pretenses, and false material promises;

*Third* - That the defendant transmitted and caused to be transmitted by way of wire, radio, and television communications, in interstate commerce, any writing, sign, signal, picture, or sound for the purpose of executing such scheme;

*Fourth* - That the defendant acted with a specific intent to defraud; and

---

[3] Fifth Circuit Pattern Jury Instruction 2.15A. (5th Cir. 2015); *United States v. Anderson*, 558 F. App'x 454, 461 (5th Cir. 2014) ("[W]e have clarified that § 1349 indeed does not contain an overt act requirement.").

*Fifth.* - That the scheme affected a financial institution.[4]

## STIPULATED FACTS

1.     Andrew **SCHERR** admits and agrees that from at least in or around 2012 through at least in or around 2016, within the Northern District of Texas and elsewhere, did willfully, that is with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, namely while engaged in the business of insurance and whose activities affect interstate commerce and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business did knowingly make a false entry of material fact in a book, report, and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, and agent of such person engaged in the business of insurance, any insurance regulatory official and agency, and any agent and examiner appointed by such official and agency to examine the affairs of such person, about the financial condition or solvency of such business, in violation of Title 18, United States Code Section 1033(c), all in violation of Title 18 United States Code, Section 371.

2.     Andrew **SCHERR** admits and agrees that from at least in or around 2012 through at least in or around 2016, within the Northern District of Texas and elsewhere, did willfully, that is with the intent to advance the conspiracy, and knowingly combine,

---

[4] Fifth Circuit Pattern Jury Instruction 2.57. (5th Cir. 2015).

Factual Resume—Page 4

conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit wire fraud, an offense against the United States, that is, to knowingly and willfully, and with an intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and in doing so affected a financial institution, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18 United States Code, Section 1349.

### Southport & Related Entities

3.      Southport Lane Management, LLC, Southport Lane, LP, and several of its affiliated companies (collectively "Southport") were incorporated in Delaware. Among other things, Southport marketed itself to insurance companies as a private equity investment holding company specializing in asset management for insurance companies. Southport also acquired several insurance companies and provided investment strategy services. As of July 2012, Southport had an office in New York, New York. At all relevant times, Southport utilized an e-mail service with servers outside Texas that stored electronic communications sent and received by Southport's employees.

4.      Administrative Agency Services, LLC ("AAS") was a Southport-affiliated entity that, among other things, purported to provide valuation services.

5.    Green Moss Partners, LLC ("Green Moss Partners") was a Southport-affiliated entity formed under Delaware law.

6.    Metcom Network Services ("Metcom") was a small, privately held fiber optics company based in New York.

### The Defendant & His Co-Conspirators

7.    **ANDREW SCHERR** served as Southport's Chief Financial Officer from in or around February 2012 until in or around December 2013, at which time **ANDREW SCHERR** became a Managing Director.

8.    Robert McGraw served as Southport's Executive Director from in or around 2012 to at least in or around 2016.

9.    Individual 1 served as an executive at Southport from in or around 2010 to in or around January 2014.

### Victim Insurance Companies & Other Relevant Entities

10.    Insurance Company A was a licensed insurer based in Dallas, Texas, that primarily offered workers' compensation policies. Insurance Company A also provided reinsurance services including through its affiliated companies. On or about March 12, 2013, Southport acquired Insurance Company A. Insurance Company A maintained an e-mail server in Dallas, Texas, that stored electronic communications sent and received by Insurance Company A employees.

11.    Insurance Company B was a licensed insurer based in Louisiana. On or about May 29, 2013, Southport acquired Insurance Company B.

12. Insurance Company C was a licensed insurer based in South Carolina. Insurance Company A and its affiliated companies were reinsurers for Insurance Company C.

13. Insurance Company D was a licensed insurer based in South Carolina with its servicing headquarters located in Tennessee. Insurance Company A and its affiliated companies were reinsurers for Insurance Company D.

14. Insurance Company E was a licensed insurer based in New York. Southport provided reinsurance services for Insurance Company E.

15. Bank A was a federally insured depository institution with a branch in Wilmington, Delaware. Bank A administered trust accounts and held investment portfolios for the benefit of Insurance Company A, Insurance Company B, Insurance Company C, Insurance Company D, and Insurance Company E (collectively, the "Victim Insurance Companies").

### The Purpose of the Scheme to Defraud

16. The purpose of the scheme was for **SCHERR**, McGraw, Individual 1, and their co-conspirators to enrich themselves and other Southport employees by defrauding the Victim Insurance Companies of cash and valuable assets through fraudulent representations and omissions of material facts.

### The Scheme to Defraud

17. From at least in or around 2012 through at least in or around 2016, **SCHERR**, McGraw, Individual 1, and their co-conspirators agreed and conspired to defraud insurance companies by causing Southport to (i) create fraudulently overvalued and illiquid

securities, and false and fraudulent documentation regarding the purported value of those securities; (ii) gain access to the investment portfolios, trusts, and assets of the Victim Insurance Companies; and (iii) strip the Victim Insurance Companies of cash and other valuable assets by replacing those assets with the fraudulently overvalued and illiquid securities created by **SCHERR**, McGraw, Individual 1, and their co-conspirators.

18.     First, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Southport to create several classes of fraudulently overvalued and illiquid securities. In addition, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Southport, including through AAS, to provide false and misleading information about the value and nature of these fraudulently overvalued and illiquid securities to Bank A, insurance companies, and insurance regulators. In truth and in fact, these fraudulently overvalued and illiquid securities were not worth the values ascribed to them by **SCHERR**, McGraw, Individual 1, and their co-conspirators. These securities were, in many instances, backed by only limited partial interests in assets of disputed or inflated value.

19.     Second, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Southport to acquire Insurance Company A and Insurance Company B and to otherwise gain access to the investment portfolios, trusts, and other assets of the Victim Insurance Companies, which contained cash and other liquid assets that these insurance companies maintained, in part, to pay future claims by policyholders. As part of their efforts to acquire Insurance Company A, **SCHERR**, McGraw, Individual 1, and their co-conspirators, while engaged in the business of insurance and in a transaction relating to the conduct of affairs of such a business did conspire to knowingly make and cause to be made false statements

with the intent to deceive the Texas Department of Insurance ("TDI") about the financial condition or solvency of Southport.

20.     Third, after gaining access to the investment portfolios, trusts, and other assets of the Victim Insurance Companies, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Southport to replace cash and other liquid assets in the investment portfolios and trusts of the Victim Insurance Companies for fraudulently overvalued and illiquid securities.   **SCHERR**, McGraw, Individual 1, and their co-conspirators fraudulently misrepresented the nature and value of these securities to the Victim Insurance Companies.

21.     As a result of the scheme, the Victim Insurance Companies were stripped of cash and other assets and left with fraudulently overvalued (in some instances worthless) and illiquid securities in their investment portfolios and trusts.   **SCHERR**, McGraw, Individual 1, and their co-conspirators used the cash and assets from the Victim Insurance Companies to enrich themselves and further the fraudulent scheme.

### SCHERR, McGraw, Individual 1, and Their Co-Conspirators Create Fraudulently Overvalued and Illiquid Securities - Destra UIT Series I, II, and III

22.     Between in or around the summer of 2012 and October 2012, SCHERR, McGraw, Individual 1, and their co-conspirators created the Destra Targeted Income Unit Investment Trusts, which originally consisted of: (i) Destra Targeted Income Unit Investment Trust Series I; (ii) Destra Targeted Income Unit Investment Trust Series II; and (iii) Destra Targeted Income Unit Investment Trust Series III (collectively "Destra UIT Series I, II, and III"). **SCHERR**, McGraw, Individual 1, and their co-conspirators planned

to use fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III to trade for cash and other assets held by the Victim Insurance Companies.

23. When Destra UIT Series I, II, and III were created, the trusts existed but contained no cash or assets. Southport sought to acquire the cash to fund Destra UIT Series I, II, and III from Insurance Company A.

24. On or about September 27, 2012, Southport provided Insurance Company A with an "investment overview" of Destra UIT Series I, II, and III that was created by **SCHERR**, McGraw, Individual 1, and their co-conspirators. The investment overview falsely claimed that the assets held by the Destra UITs consisted of: (i) 60% U.S. government securities, which according to a disclaimer did not include investments in derivative securities; (ii) 36% "TIO Asset Backed Securities," which purportedly consisted of investments in "non-real estate tangible assets;" and (iii) 4% loan payments issued to Premium Wine Acquisitions that were secured by "real property and agricultural equipment."

25. On or about October 1, 2012, **SCHERR**, McGraw, Individual 1, and their co-conspirators induced Insurance Company A to purchase fraudulently overvalued shares of Destra UIT Series I, II, and III through Bank A for approximately $30,000,000. **SCHERR**, McGraw, Individual 1, and their co-conspirators knew that Destra UIT Series I, II, and III were not yet funded and knew that the investment overview provided to Insurance Company A was false and fraudulent because Destra UIT Series I, II, and III did not actually hold any of the assets identified in the overview.

26.   **SCHERR**, McGraw, Individual 1, and their co-conspirators used a portion of Insurance Company A's $30,000,000 investment to further the scheme and enrich themselves. Specifically, on or about October 16, 2012, **SCHERR**, McGraw, Individual 1, and their co-conspirators wired, or caused to be wired, approximately $640,000 to accounts controlled by Southport employees, including a wire of $350,000 to a bank account controlled in whole or in part by **SCHERR**, and a wire of $100,000 to a bank account held by Individual 1. Additionally, on or about October 3, 2012, **SCHERR**, McGraw, Individual 1, and their co-conspirators wired, or caused to be wired, approximately $3,000,000 to an account controlled by Southport.

27.   After Insurance Company A purchased fraudulently overvalued shares of Destra UIT Series I, II, and III, **SCHERR**, McGraw, Individual 1, and their co-conspirators used a portion of the funds from Insurance Company A to purchase interests in assets that to be held by Destra UIT Series I, II, and III, including: (i) shares in a company that made derivative investments in U.S. government bonds; (ii) a vineyard in Long Island, New York; and (iii) a limited interest in a purported original painting by Michelangelo Caravaggio, titled David with the Head of Goliath (the "Caravaggio Painting").

### SCHERR, McGraw, Individual 1, and Their Co-Conspirators Fraudulently Misrepresent Southport's Interest in the Caravaggio Painting

28.   On or about October 1, 2012, **SCHERR**, McGraw, Individual 1, and their co-conspirators, through Southport and AAS, represented to Bank A that Destra UIT Series I, II, and III had a collective $195,000,000 in value and were secured by assets including a $128,000,000 interest in the Caravaggio Painting.

29.   In truth and in fact, however, **SCHERR**, McGraw, Individual 1, and their co-conspirators knew that the representations to Bank A, including the purported $128,000,000 interest in the Caravaggio Painting, were false because at the time, neither Southport nor the Destra UITs held any interest in the Caravaggio Painting (and did not acquire any interest in the Caravaggio Painting until at least October 25, 2012).

30.   Moreover, **SCHERR**, McGraw, Individual 1, and their co-conspirators knew the limited interest in the Caravaggio Painting that Southport acquired on or about October 25, 2012, was only worth a small fraction of the alleged $128,000,000 value that **SCHERR**, McGraw, Individual 1, and their co-conspirators represented to Bank A.

31.   In or around October 2012, **SCHERR**, on behalf of Southport and affiliated entities, acquired an interest in the Caravaggio Painting for the purpose of using that interest to fund Destra Series I, II, and III. As a result of negotiations to acquire this interest in the Caravaggio Painting, **SCHERR** learned that according to one report, the Caravaggio Painting was not an authentic original painting and was thus worth merely a fraction of the $128,000,000 that **SCHERR** and others claimed the Caravaggio Painting was worth.

32.   In addition, **SCHERR** knew that the interest Green Moss Partners possessed in the Caravaggio Painting—and, in turn, the interest that Green Moss transferred to Southport—was limited. Among other limitations, Green Moss Partners could not sell, exchange, or otherwise dispose of the Caravaggio Painting without express written consent, and Green Moss could not permit a security interest to attach to the painting without prior consent. Moreover, Green Moss never took possession of the Caravaggio Painting, and could not access the painting without prior written consent.

33.   Despite and contrary to these restrictions, on or about October 25, 2012—the same date **SCHERR** and Green Moss Partners acquired an interest in the Caravaggio Painting—**SCHERR** sold the interest in the Caravaggio Painting to Southport in exchange for a $38,500,000 promissory note.  Over the course of the scheme, Southport, at the direction of **SCHERR**, McGraw, Individual 1, and their co-conspirators, paid only $1,570,000 on this promissory note.

34.   Despite paying only $1,570,000 on the promissory note for a substantially limited and encumbered interest in the Caravaggio Paining, **SCHERR**, McGraw, Individual 1, and their co-conspirators falsely represented to Bank A that Southport's interest in the Caravaggio Painting was worth approximately $128,000,000.

35.   In addition, **SCHERR**, McGraw, Individual 1, and their co-conspirators falsely represented to Bank A that the combined net asset value of Destra UIT Series I, II, and III was approximately $195,000,000.  Between in or around October 2012, to in or around January 2014, **SCHERR**, McGraw, Individual 1, and their co-conspirators also caused AAS to provide Bank A with asset valuations for Destra UIT Series I, II, and III on a quarterly basis that fraudulently and falsely represented that the net asset value of Destra UIT Series I, II, and III during this time period was approximately $195,000,000.

### SCHERR, McGraw, Individual 1, and Their Co-Conspirators Make Fraudulent Misrepresentations to Gain Control of Insurance Company A

36.   As part of the transaction to acquire Insurance Company A, Southport was required to satisfy certain state regulatory requirements and obtain approvals from state regulators, including TDI.

37.   In order to obtain the necessary approvals from TDI, among other things, **SCHERR**, McGraw, Individual 1, and their co-conspirators made false and fraudulent representations to TDI about Southport's assets and capital contributions, Southport's investors, and the availability and use of cash funds for closing of the acquisition.

38.   On or about September 27, 2012, Individual 1 provided Insurance Company A with an "investment overview" of the Destra UITs, prepared by **SCHERR**, Individual 1, and their co-conspirators, which falsely stated that assets held by Destra UITs included: (a) 60% U.S. government securities, which according to a disclaimer did not include investments in derivative securities; (b) 36% "TIO Asset Backed Securities," which purportedly consisted of investments in "oil [and] gas reserves and other non-real estate tangible assets"; and (c) 4% loan repayments issued to Premium Wine Acquisitions that were secured by "real property and agricultural equipment."

39.   On or about October 19, 2012, **SCHERR** provided TDI with an affidavit accompanying the financial statements of Southport, falsely certifying that the financial statements were a "true and correct presentation of the financial condition" of Southport.

40.   One condition imposed by TDI was that Southport inject $50,000,000 in cash into Insurance Company A at the closing date, which was set for on or about March 12, 2013. McGraw and Individual 1 knew that Southport did not have $50,000,000 in cash to inject into Insurance Company A. Thus, on or about March 11-12, 2013, McGraw and Individual 1 created, or caused to be created, the "Beaconsfield Securities" that they valued at approximately $50,000,000. McGraw and Individual 1 knew at the time the Beaconsfield Securities were created that they were not worth $50,000,000, as the value

for the Beaconsfield Securities was wholly derived from owning shares of the fraudulently overvalued and illiquid Destra UIT Series I, II, and III.

41. Ultimately, based on the misrepresentations of **SCHERR**, McGraw, Individual 1, and their co-conspirators, TDI approved Southport's acquisition of Insurance Company A. Southport, at the direction of **SCHERR**, McGraw, Individual 1, and their co-conspirators thereafter acquired Insurance Company A and used the Beaconsfield Securities to create the illusion of $50,000,000 in cash being injected into Insurance Company A.

42. After Southport acquired Insurance Company A, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Bank A to exchange cash and liquid assets in the investment portfolios or trusts for Insurance Company A and Insurance Company B for fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III.

43. **SCHERR**, McGraw, Individual 1, and their co-conspirators also caused Bank A to replace cash and liquid assets in trust accounts of Insurance Company C, Insurance Company D, and Insurance Company E with fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III. Bank A then provided account statements to the Victim Insurance Companies that reflected overvalued holdings in Destra UIT Series I, II, and III.

### SCHERR, McGraw, Individual 1, and Their Co-Conspirators Create Additional Series of Fraudulently Overvalued Destra Securities

44. In or around October 2013, **SCHERR**, McGraw, Individual 1, and their co-conspirators created Destra Targeted Income Unit Investment Trust Series IV; and (ii)

Destra Targeted Income Unit Investment Trust Series V (collectively "Destra UIT Series IV and V"), which were purportedly backed in part by a limited interest in a small fiber optic company and other assets.

45.   As with Destra UIT Series I, II, and III, **SCHERR**, McGraw, Individual 1, and their co-conspirators, through Southport and AAS, were responsible for providing documentation to Bank A showing the "net asset value" of the assets held in Destra UIT Series IV and V.

46.   In or around November 2013, **SCHERR**, McGraw, Individual 1, and their co-conspirators caused Southport and AAS to falsely represent to Bank A that the assets held by Destra UIT Series IV and V were collectively worth $140,000,000, including of $100,000,000 of "shares" purportedly providing an interest in Metcom (the "Fiber Optic Shares") and other assets. Based on the false representations made by **SCHERR**, McGraw, Individual 1, and their co-conspirators, through Southport and AAS, Bank A created Destra UIT Series IV and Series V and recorded the net asset value of these trusts as $140,000,000.

47.   In truth and in fact, however, **SCHERR**, McGraw, Individual 1, and their co-conspirators knew that the Fiber Optic Shares placed in Destra UIT Series IV and V were worth only a small fraction of the purportedly $100,000,000 that **SCHERR**, McGraw, Individual 1, and their co-conspirators claimed.

48.   As **SCHERR** knew, Metcom was a small company with limited revenue. In or around November 2013, **SCHERR** caused Metcom to create the Fiber Optic Shares and loan them to a holding company for five years in exchange for an initial payment of $300,000, and annual payments of $800,000. The holding company, in turn, sold the

loaned Fiber Optic Shares to Southport in exchange for two promissory notes totaling $80,000,000. Southport did not make any payments under these promissory notes. Thus, Southport, as **SCHERR** knew, had no actual ownership interest in the Fiber Optic Shares, which, as **SCHERR** knew, were worth substantially less than their alleged $100,000,000 value.

49. Despite Southport's limited interest in the Fiber Optic Shares, **SCHERR**, McGraw, Individual 1, and their co-conspirators continued to falsely represent to Bank A that Destra UIT Series IV and V had a net asset value of $140,000,000, including an interest in the Fiber Optic Shares worth over $100,000,000.

50. Between in or around November 2013, to in or around January 2014, **SCHERR**, McGraw, Individual 1, and their co-conspirators also caused AAS to provide Bank A with asset valuations for Destra UIT Series IV and V on a quarterly basis that fraudulently and falsely represented that the net asset value of Destra UIT Series IV and V was approximately $140,000,000.

51. **SCHERR**, McGraw, Individual 1, and their co-conspirators also caused Bank A to replace cash and liquid assets in trust accounts of the Victim Insurance Companies with fraudulently overvalued and illiquid shares of Destra UIT Series IV and V. Bank A then provided account statements to the Victim Insurance Companies that reflected overvalued holdings in Destra UIT Series IV and V.

### Victims of the Fraudulent Scheme

52. The scheme to defraud caused in excess of $350,000,000 in collective losses to the Victim Insurance Companies and resulted in substantial financial hardship to the Victim Insurance Companies.

53. Specifically, after **SCHERR**, McGraw, Individual 1, and their co-conspirators converted the majority of the cash and liquid assets in the investment portfolio and trusts of Insurance Company A into fraudulently overvalued and illiquid securities and fraudulent financial instruments, Insurance Company A was placed into liquidation on or about August 15, 2014.

54. Insurance Company B, Insurance Company C, and Insurance Company D have each suffered substantial financial hardship from having cash and other valuable assets converted into fraudulently overvalued and illiquid securities.

### Overt Acts and Interstate Wires in Furtherance of the Scheme

55. On April 16, 2012, in the Northern District of Texas and elsewhere, **SCHERR** did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings to Southport and Insurance Company A attaching materials for meeting with Texas Department of Insurance, in furtherance of the scheme to defraud as described above.

56. On October 19, 2012, **SCHERR**, while engaged in the business of insurance, and while being involved in a transaction relating to the conduct of affairs of such a business, knowingly provided TDI with an affidavit accompanying the financial statements of Southport and certifying that the financial statements were a "true and correct

presentation of the financial condition" of Southport, with the intent to deceive TDI about the financial condition of Southport, in furtherance of the scheme to defraud described above.

57. In or around September 2013, **SCHERR**, McGraw, Individual 1, and others caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, and III, in furtherance of the scheme to defraud described above.

58. In or around October 2013, **SCHERR**, McGraw, Individual 1, and others caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, and III, in furtherance of the scheme to defraud described above.

59. In or around January 2014, **SCHERR**, McGraw, Individual 1, and others caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, III, IV, and IV, in furtherance of the scheme to defraud described above.

60. The defendant agrees that this factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. Rather, the limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Counts One and Two of the Indictment.

AGREED AND STIPULATED TO this 2nd day of January 2020.

ROBERT ZINK
Chief, Fraud Section
Department of Justice, Criminal Division

ANDREW SCHERR
Defendant

DANNY LAM NGUYEN
Trial Attorney, Fraud Section
CAITLIN R. COTTINGHAM
Assistant Chief, Fraud Section
Department of Justice, Criminal Division

PETER GINSBERG
Attorney for Defendant

BRIAN K KIDD
Chief, Market Integrity and Major Frauds
Unit, Fraud Section
Department of Justice, Criminal Division

ERIN NEALY COX
United States Attorney for the Northern
District of Texas

J. NICHOLAS BUNCH
Deputy Chief, Criminal Division
MARY WALTERS
Assistant United States Attorney
United States Attorney's Office for the
Northern District of Texas

## DEFENDANT'S ACKNOWLEDGEMENT

The defendant agrees that the defendant committed all the essential elements of the offenses.

I have read and discussed the factual resume with my attorney. I agree and acknowledge by my signature that this statement of facts is correct.

ANDREW SCHERR
Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I acknowledge by my signature that I have read and discussed the statement of facts with my client.

PETER GINSBERG
Attorney for Defendant